## P. W. HAZELWOOD v. CHARLES ROGAN, COMMISSIONER OF THE GENERAL LAND OFFICE.

### No. 1073. Decided March 17, 1902.

**1.—Land Office—Purchaser—Reinstatement—Mandamus—Legal Remedy.**

An applicant who, by compliance with the law for purchase of school land, has been awarded the right to buy certain lands by the Land Commissioner, when the latter has wrongfully canceled such award, is entitled to mandamus to compel his reinstatement as such purchaser, the remedy being necessary in order to enable him to complete his payments and receive patents, though as against adverse claimants he has a legal remedy by suit in trespass to try title. (Pp. 303, 304.)

**2.—School Land—Lessee—Prior Right to Purchase—Assignee.**

The prior right to purchase school lands as an actual settler, secured to a lessee thereof for sixty days after expiration of his lease by section 6 of the Act of April 19, 1901 (Laws, 1901, page, 296), is given to the lessee only, and not to his assignee. (Pp. 304, 305.)

**3.—Absolute Lease Line—Improvements—Renewal—Sale.**

The lessee of a section of land in the absolute lease district who has placed thereon improvements of the value of $200, is given, by the exception contained in section 5 of the Act of April 19, 1901, a right to renew his lease upon its expiration, without having the land first exposed to sale for sixty days, but unless he does so the land remains, during the sixty days, open to purchase or lease by another applicant. (Pp. 305, 306.)

4.—School Land—Lease—Expiration of Term.

See opinion as to whether a lease of school land for two years, made on August 26, 1899, had expired on the morning of August 26, 1901.  (P. 306.)

5.—School Land—Expiration of Lease—Premature Application to Purchase.

It seems that an application to purchase leased school land within the absolute lease district, made before the expiration of the lease, ought not to prevail over an application made after its expiration; since every qualified person should have an equal chance in the race of diligence after the expiration of the term placed the lands again on the market.  (P. 306.)

6.—Same.

Where application to purchase leased school land was filed with the county clerk on the last day of the term of the lease, and was received and acted on by the Commissioner of the General Land Office after the expiration of the term, it would be but an empty form to require a renewal of the application, where no superior intervening rights had attached and an award made to the applicant by the Commissioner gave him a right to the land.  (Pp. 306, 307.)

7.—Purchase of School Land—Settler—Additional Sections—Aggregate Amount.

Under article 4218f, Revised Statutes, as amended (Laws of 1897, page 184; Laws of 1901, page 294) the limitation of the right of a settler to purchase school lands to four sections means four original surveys, though they do not embrace an aggregate of 2560 acres.  A settler whose "home" was a quarter section of 160 acres, and who had purchased in addition two sections of 640 acres each and another survey known in the Land Office and described in his application as "section 65," but containing only 457 acres, could not purchase a fourth "additional section," making five surveys, though aggregating only 2537 acres.  (Pp. 307-309.)

Original application for writ of mandamus from the Supreme Court to the Commissioner of the General Land Office.

*Ashby S. James* and *E. H. Yeiser,* for relator.—We think there can be no doubt that by a section of land, under our land system, is meant 640 acres of land.  The courts of this State have never held that a tract of land containing less than 640 acres is a section of land in contemplation of the law.  The Act of April 19, 1901, prohibits the Land Commissioner from selling to any purchaser more than four sections of public free school land, without any other limitations or qualifications; and we respectfully submit that under this act any citizen of this State residing upon a fractional tract of school land is authorized to purchase, within a radius of five miles of such home tract, other sections of sufficient quantity to make four sections of 640 acres each of public free school land.  This contention is supported by a subsequent paragraph of the act requiring the purchaser to disclose the prior lands purchased, and stating that if the land already purchased aggregates four sections, then his subsequent application for other land shall be rejected.  If, however, the court's opinion is adverse to relator, then there can certainly be no doubt that the relator is entitled to the first three sections applied for by him, for the reason that these several sections were applied for and the applications therefor duly filed with the county clerk of Kimble County, on the 26th day of August, 1901, at the hours of 7 o'clock a. m., 7:01 o'clock a. m., and 7:02 o'clock a. m., as will appear from the indorsement of the county clerk on the several applications,

and therefore if the contention of the Land Commissioner be sustained, these three applications, all being prior to the last application, did not aggregate more than four sections of public free school land when considered in connection with his home tract of 160 acres. It was therefore the duty of the Land Commissioner to have sold and awarded in any event these three tracts applied for; for certainly a subsequent application for an additional tract could not invalidate the prior application of relator filed in full compliance with the law, and seeking to purchase only three surveys of public free school land. We therefore insist that even should this court be of the opinion that by the word section is meant a tract of school land of less than 640 acres, nevertheless it should award a writ of mandamus requiring the Commissioner to sell the first three tracts applied for by relator to him and notify the clerk and State Treasurer of the fact of the sale.

The law regulating the lease of public free school land only conferred a preference right to purchase four sections of the same upon the original lessee from the State, and the lessee of a large number of sections of school land from the State could not by subdividing his lease and attempting to transfer the different sections thereof to other parties confer a preference right to purchase the various tracts leased by him upon such assignees. Acts 27th Leg., p. 295; De Poyster v. Baker, 89 Texas. 155.

The court's attention is called to the fact that the construction of the law contended for by relator, to wit, that the assignee of a lease is not entitled to any preference right to purchase the surveys of school land the lease upon which has been assigned to him, is a construction which has uniformly been given to the law by the Commissioner of the General Land Office under the advice of the Attorney-General's department of this State, and therefore the action of these two departments in so construing the law is persuasive at least of the contention made by relator. If the contention of the adverse parties be sustained by this court, then every large leaseholder and cattle corporation now holding a large number of surveys under lease from the State of Texas can subdivide his lease into blocks of four sections each and thereby confer a preference right to purchase each block of four sections upon his assignee, and thereby the equal right of all of the citizens of this State to acquire portions of the school land of this State would be absolutely denied, and each leaseholder will be afforded an opportunity to speculate upon the school lands of this State held by him under lease, by subdividing his leasehold and selling it for a bonus just before the expiration of his lease to assignees in order to confer upon them a preference right to purchase the land assigned to them. It was certainly never the intention of the Legislature to afford large leaseholders such an opportunity for speculation upon the public lands of this State, which they hold under an absolute lease made to them by the State of Texas, which has withdrawn the land from the market and has prevented actual settlers from purchasing same.

A lease contract made by the State of Texas with a lessee for the period of two years from August 26, 1899, expires at 12 o'clock on the night of August 25, 1901.

These lands were all placed on the market for sale and lease under the Act of the Twenty-sixth Legislature, page 123, which act took effect on the 26th day of August, 1899, and under this act, Schreiner, as a lessee from the railway company, had a preference right to become the lessee from the State of the lands then held by him under lease from the railway company, and this preference right he exercised by filing his application on the morning of the 26th day of August, 1899, at the very minute the doors of the Land Office were open for business, and having exercised this right on that day his lease immediately commenced when his application was filed in the General Land Office, and when the lease contract was executed by the State it related back to the time of the filing of his application and commenced to run at the very time his application was filed in the General Land Office; therefore, having commenced to run on the 26th day of August, 1899, by virtue of its terms it expired at 12 o'clock on the night of August 25, 1901. At the time Schreiner filed his application to lease he was in possession of the four tracts of land here in controversy under a lease from the railway company, and his possession of the land commenced under his application as a lessee of the State on the 26th day of August, 1899, when his application was filed. Griffith v. Boggett, 59 U. S., 158; Marys v. Anderson, 24 Pa. St., 272; Buchanan v. Whiteman, 151 N. Y., 253; People v. Robertson,. 39 Barb., 9; Lysle v. Williams, 15 S. & R. (Pa.), 135; Acts of 26th Leg.,. p. 123; Acts 27th Leg., p. 295.

The clause contained in section 5 of the Acts of the Twenty-seventh Legislature, page 295, providing that at the expiration of any lease in. the absolute lease district the land shall remain subject to sale for a. period of sixty days, "except where there are improvements on a section of the value of $200 or more," does not mean that such a section is. absolutely withdrawn from sale, but must be construed in connection. with section 6 of the same act giving the lessee a preference right to purchase four sections of his leasehold at the expiration of his lease, and. the other clause of section 3 giving a leaseholder the right for sixty days. after expiration of lease to remove his improvements.

It was clearly the intention of the Legislature to confer upon the leaseholder a preference right to purchase only four sections out of his leasehold, the same amount that any other actual settler is entitled under the: law to purchase, but in order to protect him in cases where he had placed valuable improvements upon certain surveys which were not within the five-mile radius provided for by law, under section 6 of the Act of the Twenty-seventh Legislature, he was authorized to purchase such sections as he had placed $500 worth of improvements on, not to exceed four sections, even though they should not be situated within the five-mile radius, and this clause must also be read in connection with a, subsequent clause of the same section which gives lessee the right for

sixty days after the expiration of his lease to remove his improvements. The Land Commissioner, by this section, was therefore only prohibited from selling a section of land which had improvements on it at the expiration of the lease and until the lessee had been allowed sixty days within which to remove his improvements. By the terms of this act, at the expiration of a lease all of the land included within it immedi- ately became subject to purchase by virtue of the termination of the lease, and immediately upon the expiration of the lease purchasers have a right to file their applications to purchase and make their first pay- ment as required by law, thereby fixing their right to secure the land, and the only power which the Land Commissioner can exercise is to suspend action upon the applications to purchase the various sections included in the leasehold until sixty days have expired within which the original lessee can remove his improvements or exercise his preference right to purchase four sections of the land. When this sixty days has expired and the lessee has failed to exercise his preference right and has failed to remove his improvements, then the Land Commissioner under the law is bound to award the land to the first applicant whose application was filed after the expiration of the lease, and who has other- wise complied with the law in the purchase thereof.

*C. K. Bell,* Attorney-General, and *T. S. Reese,* Assistant, for respond- ent Rogan, Commissioner.—The writ of mandamus will not issue in be- half of a party who has some other adequate statutory or common law remedy. Tappan on Mandamus, 58; Merrill on Mandamus, chap. 2; Steele v. Goodrich, 87 Texas, 401; Board Land Commrs. v. Bell, Dall., 366.

The relator has adequate, full, and complete remedy at law, without the issuance of the writ of mandamus by the court. According to the allegations of his petition relator has made application to the Com- missioner of the General Land Office to purchase this section of land. He alleges a full compliance with all the provisions of the statute to en- title him to have the land awarded to him as a purchaser. If the allega- tions of his petition are true, he is entitled not only to have the land awarded to him on his application, but he is entitled to the land and the immediate possession thereof. He could take possession of the land and hold it against all the world, or if held adversely could recover the land and the possession thereof with adequate damages, in an ordinary suit of trespass to try title in the district court. The application to purchase and compliance with the statutory requirements entitled him to the lands, and the award of the Commissioner of the General Land Office was not necessary to the full enjoyment of his right. Perez v. Canales, 69 Texas, 674; Metzler v. Johnson, 1 Texas Civ. App., 137; Cattle Co. v. Bacon, 79 Texas, 12; Watts v. Wheeler, 10 Texas Civ. App., 117.

In substance, so far as the respondents Thomas and W. R. Nichols are concerned, this is a suit to determine the respective rights of relator and said Thomas and W. R. Nichols to the land. Thomas and W. R.

Nichols are necessary parties to any mandamus proceedings in which their rights are involved. This court has no jurisdiction, in an original proceeding, to determine the respective rights of relator and Thomas and W. R. Nichols. Hence relator should be remitted to the district court, which has full jurisdiction to try the issue and afford complete relief. Smith v. Power, 2 Texas, 68; Cullem v. Latimer, 4 Texas, 329; Tabor v. Commissioner, 29 Texas, 510.

Upon the proposition that in computing the time which the lease to Schreiner had to run the 26th of August is to be included and the lease terminate at 12 o'clock p. m. of the 25th of August, the following authorities are cited in addition to those cited in the brief of counsel for relator: O'Connor v. Townes, 1 Texas, 107; Taylor v. Brown, 147 U. S., 640; Pearpont v. Graham, 4 Wash. (C. C.), 240; Taylor v. Jacoby, 2 Pa., 495; Houser v. Reynolds, 1 Haywood, 114; Fox v. Nathans, 32 Conn., 348; Marys v. Anderson, 24 Pa. St., 272; Buchanan v. Whitman, 76 Hun, 67; Buchanan v. Whitman, 151 N. Y., 253; Hatter v. Ash. 1 Ld. Raymond, 84; Seignorett v. Noguire, 2 Ld. Raymond, 1241.

The lease was for "a term of two years from the 26th day of August, 1899," and was dated 22d November, 1899. The application to lease was filed in the General Land Office at 8 o'clock a. m., August 26, 1899. It was clearly the intention of the parties that the lease contract should be effective from the date of the filing in the General Land Office, and that the two years should begin to run on that date.

Respondent Rogan further agrees with relator in his contention that the prior right to purchase given to the lessee by section 6, chapter 125, Acts of the Twenty-seventh Legislature, does not pass to the assignee of the lessee in whole or in part, but is limited to the original lessee. Such has been the construction of the statute upon which respondent has uniformly acted. The laws regulating the rights and relations between landlord and tenant growing out of lease contracts between private individuals afford very little if any guidance in the construction of the statutes respecting the lease of public lands. The statute is intended to provide a complete system, and when the construction is doubtful we can only strive more or less successfully to discover and carry out the intention of the Legislature. In construing an entirely dissimilar statute this court held in DePoyster v. Baker, 89 Texas, 155, that the words "purchaser and lessee" did not include an assignee of either.

Can a lessee of 100 sections by dividing his lease into 25 parcels of four sections each and transferring the same a few days before the expiration of the lease to twenty-five different assignees, give to each the right to purchase four sections out of the pasture so assigned? Or if he assigns four sections out of the lease, retaining 96 sections himself, how is the prior right to purchase to be decided?

*West & Cochran* and *E. Cartledge*, for respondents Nichols.—The lands involved in this suit were embraced in a lease to Charles Schreiner, which by its terms was to run "for a term of two years from the 26th

day of August, 1899," and hence did not expire until at midnight on the night of August 26, 1901,—or until at the end of August 26, 1901,—and therefore the applications made by the relator on the morning of August 26, 1901, were premature and conferred no rights upon him whatever. Under the law, lands under lease in a county situated in the absolute lease district, as is Kimble, are not subject to sale to anyone, except the lessee, until after the expiration of such lease. Laws of 1901, Reg. Ses., sec. 5, p. 295. As to when Shreiner's lease expired: 26 Am. and Eng. Enc. of Law, 1 ed., p. 4, et seq.; 14 Am. and Eng. Enc. of Law, 2 ed., p. 553, et seq.; Hill v. Kerr, 78 Texas, 217; Cobb v. Webb, 64 S. W. Rep., 792; Halbert v. Association, 89 Texas, 230; Smith v. Dickey, 74 Texas, 63; Lubbock v. Cook, 49 Texas, 101; Burr v. Lewis, 6 Texas, 81; O'Conner v. Townes, 1 Texas, 107; Hollis v. Francois, 1 Texas, 119; Bigelow v. Willson, 1 Pick., 485; Goode v. Webb, 52 Ala., 452; Weld v. Barker, 153 Pa. St., 465; Sheets v. Selden Lessee, 2 Wall., 190; Best v. Polk, 18 Wall., 112; Ackland v. Lutley, 9 Adolphus & Ellis, 879; Gorst v. Lowndes, 11 Simon, 434; Parsons on Contracts, 2 ed., sec. 176; Whart. on Cont., sec. 895; 1 Beach on Cont., sec. 631; Wood's Landl. and Ten., 2 ed., 605; Taylor on Landl. and Ten., 8 ed., sec. 78; Suth. on Stat. Const., sec. 10, p. 135.

The applications of relator made on the morning of August 26, 1901, should not be considered as having any force on that day or any subsequent date. His applications made and filed with the county clerk at a time when the lands applied for were not subject to sale can not be considered as continuing, nor can such applications be made to attach to conditions which might thereafter arise. Gracey v. Hendrix, 93 Texas, 26; Willoughby v. Townsend, 93 Texas, 81; McKinney v. Grassmeyer, 51 Texas, 376; Busk v. Lowrie, 86 Texas, 128; Snyder v. Nunn, 66 Texas, 529; Wright v. Hawkins, 28 Texas, 470; Cordill v. Moore, 43 S. W. Rep., 299; Acts 1901, Reg. Ses., sec. 2, p. 293.

Relator should not be awarded the three sections which were duly transferred and assigned to the Nicholses by Schreiner, because, in pursuance of such transfer to them, the Nicholses became lessees of the State, and as such had the right, first, to purchase the land at any time before the expiration of Schreiner's lease, and second, each had a preference right, for a period of sixty days after said lease expired, within which to buy the three surveys which had been transferred to them by Schreiner.

The relator should not be awarded section 85, because at the expiration of the Schreiner lease that section had improvements thereon of the value of $200 or more, and therefore under the law said section was not subject to sale even after the expiration of said lease except to the lessee. Acts 1901, Reg. Ses., secs. 5 and 6, pp. 295-296.

Recapitulating, we insist so far as these respondents are concerned that the relator should be denied his relief because: First. He applied for the lands at a time when they were not on the market but especially

reserved. Second, the lands, and especially section 85, by the very terms of the law, were subject to the prior right of these respondents.

GAINES, CHIEF JUSTICE.—This is a petition for the writ of mandamus to compel the respondent, the Commissioner of the General Land Office, to reinstate the relator as purchaser of certain sections of school lands lying in the county of Kimble and described as sections 65, 83, 85, and 101, in the name of the Galveston, Harrisburg & San Antonio Railway Company. W. R. Nichols and Thomas Nichols, each of whom was asserting and still asserts an adverse claim to certain of the sections in controversy, were made parties defendant, and for the sake of convenience will be so styled during the course of this opinion.

The allegations of the amended petition show the facts hereinafter stated, but we set them out in chronological order. On the 26th day of August, 1899, Charles Schreiner made application to the Commissioner of the General Land Office to lease ten surveys of school lands including those in controversy, and on the 22d day of November next thereafter the Commissioner accepted his bid and executed to him a lease "for a term of two years from the 26th day of August, 1899." On the 20th day of November, 1900, Schreiner conveyed his right in section 85 to defendant W. R. Nichols, and on April 8, 1900, also conveyed to the same party his right in section 101. On the day last named, he also conveyed to Thomas Nichols his right in section 65. On the 26th day of August, 1901, the relator, being an actual settler upon and a purchaser of 160 acres of school lands, filed successively with the county clerk of Kimble County separate applications to purchase the respective surveys in controversy, complying in all respects with the law. That for section 65 was filed at 7 a. m., that for section 101 at 7:01 a. m., that for section 85 at 7:02 a. m., and that for section 83 at 7:03 a. m. Each of the sections so applied for were within a radius of five miles of the applicant's home tract. On the same day, defendant W. R. Nichols filed his three separate applications to purchase three of the sections; section 85 at 7:12 a. m., section 83 at 7:14 a. m., and section 65 at 8:05 a. m. In conformity to the statute, the clerk forwarded all these applications, with the respective obligations for purchase money, to the Commissioner of the General Land Office, and also the cash installments of purchase money to the State Treasurer. On the 3d day of September next thereafter, the applications of the relator were approved by the Commissioner and on the 20th day of the same month the lands were awarded to him, but on the 30th the award was canceled upon the ground that the statute allowed him to purchase three sections only in addition to his home purchase. According to the allegation in the body of the petition, on the 9th of September, 1901, the defendant Thomas Nichols filed with the county clerk an application to purchase section 63 and made first payment, which were duly forwarded to the Commissioner and State Treasurer respectively. But a certified copy of the application is filed as an exhibit to the petition, and it appears clearly therefrom that the appli-

·cation was filed on the 9th day of October. The acceptance of the applications of the relator was canceled by the Commissioner solely on the .ground that he applied to purchase four surveys in addition to his home-·stead survey (already purchased) and that he was entitled to purchase but three. The land already purchased by relator and upon which he resided as an actual settler contained only 160 acres and section 65 em-braced only 456 acres and a fraction of an acre. Hence his claim of right to purchase the four sections applied for,—all, together with his home tract, containing less than 2560 acres, or four sections of 640 ·acres each.

The answer of the respondent, the Commissioner of the General Land Office, and that of the defendant are practically demurrers to the peti-tion. The respondent, however, concedes the legality of relator's pur-·chase, provided he was entitled, as claimed by him, to purchase four .additional sections,—so as to make up a complement of 2560 acres or four full sections in all. The point is made both by respondent and by defendants, that the writ should not issue because the relator has a plain, :adequate, and complete remedy at law.

Defendants also contend that the relator's applications are invalid for ·the reasons, (1) that they were filed on the day before Schreiner's lease ·expired; (2) that the defendants, as assignees of the lease of Schreiner, had, for the period of sixty days after the expiration of the term, a prior ·right to purchase the sections respectively claimed by them; and (3) ·that the relator in no event had the right to purchase section 85, for the reason that it was a leased section and had upon it at the expiration of ·the term improvements of the value of $200.

If the plaintiff has an adequate legal remedy without resort to the writ of mandamus, he is not entitled to maintain this suit, however just his claim. If no legal obstacle to the purchase of the lands existed at the time he filed his application with the county clerk, by complying ·with the terms of the statute for such purchase, he acquired a title suffi-·cient to enable him to maintain an action of trespass to try title against all adverse claimants and to have his rights adjudicated as between him and them. Such a suit, although prosecuted to a successful issue by him, ·would not restore him to his position as a recognized and accepted pur-·chaser on the records of the General Land Office, nor upon the books of the treasury department. If a lawful purchaser, he has the right to make his annual payments upon his obligation and to have a credit therefor. He may ultimately have the right to have ·patents issued to him for the lands. Under the statute, a purchaser of school lands may sell to another actual settler and may have his vendee's obligation sub-stituted for his own. Clearly the fact of the cancelation of the award as ·a purchaser of the land made in his favor and the rejection of his appli-cation would so cloud his title as to operate to his injury in a sale of the property. The disadvantage of his position is obvious and it is evi-dent that a successful suit against the adverse claimants only would not afford an adequate and complete remedy for the wrong. We therefore

conclude that the relator is entitled to maintain his suit, and that if he has established his right he is entitled to the writ of mandamus for which he has prayed.

Having reached the conclusion that the relator, if a purchaser, has a right to have a writ of mandamus issued in order to compel his reinstatement as such upon the records in the Land Office, we will next inquire whether the defendants, as assignees of the lease of Schreiner, had a prior right for sixty days to purchase the sections the leases to which were respectively assigned to them. This right is claimed by virtue of section 6 of the Act of April 19, 1901, entitled "An act relating to the sale and lease of the public free school and asylum lands and to repeal all laws and parts of laws in conflict therewith." So much of that section as is pertinent to the inquiry reads as follows: "Any lessee shall have sixty days prior right to purchase lands as an actual settler at expiration of his lease." Laws 1901, p. 296. The question is, does the word "lessee" mean the original lessee only, or does it include assignees of the lease. We are of the opinion that the Legislature intended to confer the right upon the lessees only and not upon those to whom the lease might be assigned. The statutes which provide for sales of the free school and asylum lands to actual settlers also provide for the sale by a purchaser to a subsequent vendee under certain conditions and for the substitution of the latter to the rights and obligations of the original purchaser. It·is not so with the act under consideration, so far as it relates to lessees of such lands, nor with any previous statute upon the subject, so far as we are aware. It would seem, therefore, that although an assignment of the lease is not expressly prohibited, such assignment was not in contemplation of the Legislature when it passed the act, and that the privilege was intended to be conferred upon original lessees only. Being a thing of value to the lessee, a prior right to purchase, even for a short time after the end of his term, tended to aid in securing leases of the lands. Hence it was to the interest of the school fund to grant the privilege to the original lessee as an inducement to a lease. The right being fixed by the lease, the school fund had no interest in conferring such privilege upon a sublessee or an assignee of the lease. To have done so would have been merely to enable the original lessee, shortly before the expiration of his term, to parcel out his holdings by assignments to third parties and thereby to confer upon them a privilege to the detriment of others equally meritorious who might desire to settle upon and purchase the lands. In the absence of some language in the statute directly indicating such a purpose, we would be loath to hold that it was intended to grant such a power. In the Act of February 23, 1900, in relation to the unsurveyed lands of the State which were by that act made a part of the school fund, a preference right to purchase was given, among other classes, "to all leaseholders of unsurveyed lands to the amount of four sections or less, who were lessees of such lands from the State of Texas on January 1, 1900, either directly or assignee of the original lessee." Laws 1900, p. 33. From this it would seem

that when the Legislature desired to confer a right upon the assignees of a lessee, they were expressly mentioned.

We come then to the question, was the relator precluded from purchasing section 85 by reason of the fact that there were improvements on it of the value of $200? Section 5 of the act last cited defines the absolute lease district and the rights and liabilities of lessees within such district. It contains the following provision: "And lands situated in the absolute lease district which may be leased shall not be sold during the term of the lease, except as provided herein. On the expiration of any lease in the absolute lease district, the lands shall remain subject to sale for a period of sixty days, except where there are improvements on a section of the value of two hundred dollars or more." Laws 1901, p. 295. The same section contains also the following provision: "On the expiration of his lease or its termination under the provisions of law, or by a final judgment of any court of competent jurisdiction, the lessee shall have the right for the period of sixty days to remove any or all improvements he shall have placed upon the leased premises." Id., p. 296. Let us compare the corresponding provision in section 4 of the act, which section relates to leases not within the absolute lease district; that is to say, in the district in which the lands could only be leased subject to sale to actual settlers. That provision is as follows: "All lands which may be leased shall be subject to sale at any time except where otherwise provided herein. * * * Any section or part of a section which may be leased shall not be sold except to the lessee, nor shall the lessee be disturbed in his possession thereof during the term of his lease when he has placed on such section or part of a section improvements to the value of two hundred dollars." Id., p. 295. It is thus seen that the right of the lessee, where his lease was made subject to a right to sale to an actual settler before the expiration of the term, was, by making improvements upon a section of the value of $200, to take it out of the rule and to make his lease absolute to such section. In the absolute lease district, as we have seen, he had, at the end of his term, a priority in the right of purchase and sixty days were allowed him for this purpose. But the purpose of the provision first quoted from section 5 was not to give a prior right to purchase a section when it had $200 worth of improvements upon it, but merely to make an exception to the rule which required, when an absolute lease had been made, that for sixty days after its termination the lands should be open to sale and should not be subject to be again leased during that period. Where a section had improvements of the value of $200 upon it, the lessee was not required to await sixty days before leasing it again, as was the case of a section without improvements of that value, but was at liberty to apply at once for a lease of such section. Any other reasonable construction would take an improved section off the market for sale altogether,—a result contrary to the entire spirit and policy of our legislation upon the subject of the school and asylum lands, and one evidently not contemplated by the

Legislature which passed the act. Conceding, then, that the original lessee, although he had assigned, had the privilege of making a new lease within sixty days from the end of his term, as we construe the provision, it did not give him an exclusive right. It was subject to lease or sale, and the applicant, whether as purchaser or lessee, who made the first application would have the prior right. Whether it was subject to lease by anyone other than the former lessee during the sixty days is a question not before us. It would seem, however, that since the exception is made by reason of the improvements, the privilege was intended to be granted to him only by whom the improvements were made. Besides, in another part of section 5, it is provided, as to sections without improvements, that in case they are not purchased within sixty days after the end of the term, the lessee shall have for thirty days a prior right to re-lease.

This brings us to the most difficult question in the case. It is contended that on the 26th of August, 1901, the lease had not expired and that therefore the applications of relator to purchase were premature and all proceedings thereunder void. This contention is based upon the proposition that since the lease was to run "for a term of two years from the 26th of August, 1899," it did not expire until the last moment of the 26th of August, 1901. The weight of authority seems to be that in construing a lease which is to run "from" a day for a certain number of days, months, or years, ordinarily the day from which it is to run is to be excluded. On the other hand, it is also held that the intent of the parties must govern and that the intent to include the day may be inferred from the context or even from the circumstances of the particular case; and it may be that had it been shown in this case that the lease to Schreiner was in the form in general use in the Land Office, and that the uniform and well known construction in that office was to include the day mentioned for the beginning of the term, such construction should govern. But in the view we take of the case, we do not find it necessary to decide the question. Let it be conceded for purposes of this opinion that the lease had not expired on the 26th of August, 1901. At all events, it expired at 12 p. m. of the night of that day. The relator's applications could not in the course of business have reached the Land Office and have been acted on until after the termination of the lease. As a matter of fact, they were received and filed in that office on the 3d of September, and the lands were not awarded to him until the 20th of that month. Now, if before the award was made and after the lease had expired another settler had made application to purchase the lands, we incline to think that such application should be held good. Every qualified person desiring to purchase school lands should have an equal chance in the race of diligence after the expiration of the term and after the lands were again upon the market for sale; and it would hardly be competent for anyone to forestall the right of another by filing his application before the lease expired. But the defendant's applications were filed after the relator had filed his and

on the same day.    Clearly they acquired no right superior to his.    Then
when the Commissioner of the General Land Office came to act upon
relator's applications and to decide whether the lands should be awarded
to him or not, there was no one having a better right standing in the
way of the award.    It seems that according to the Commissioner's con-
struction of the lease, the term was at an end when he awarded the land.
But let us admit that he erred in so holding and let us suppose that he
considered that the lease was not then terminated.    Was it his duty to
reject the applications on this ground merely and to require new appli-
cations to be filed?    Would such a requirement have accomplished any-
thing more than the going through an empty form?    He had the re-
lator's obligations, the cash payments had been made, and the applicant
had filed his affidavit as required by the law.    The Constitution requires
the Legislature to provide for the sale of the school lands; and the
policy of our legislation has been to promote such sales, and, with a
view to populate the unsettled districts of the State, to favor those pur-
chasers who had already settled upon and purchased a section or part
of section of the lands, as well as those who seek to acquire the lands
for the purpose of making their homes upon them.    It comports neither
with the spirit nor policy of this legislation to throw around settlers
applying to purchase unnecessary and improvident restrictions.    We
are therefore of the opinion that since the lands had been awarded to the
relator before any superior intervening rights had attached, the award
should not have been set aside for the mere irregularity in making the
application on the day before the lease had expired, if in fact it had not
expired.

But was the relator entitled to purchase the four additional surveys
for which he applied?    Some complication with reference to this ques-
tion arises from the fact that the Act of April 19, 1901, does not pur-
port to be an amendment of the previous statutes upon the same sub-
ject, but in express terms repeals all laws in conflict therewith.    It does
not expressly confer upon a purchaser of a part of the school lands a
right to purchase additional lands.    Section 3, however, contains the
following language:    "The Commissioner of the General Land Office is
hereby prohibited from selling.. to the same party more than four sec-
tions of land, and all applications to purchase land shall also disclose
the prior lands purchased by the applicant from the State, if any, since
the taking effect of this act, and the residence of the applicant at said
time, and if it appear therefrom or from the records in the land office
that said applicant has already purchased land aggregating four sec-
tions since the taking effect of this act, his application shall be rejected;
provided, this shall not apply to sales made to a purchaser and after-
wards canceled as invalid for some reason other than abandonment and
where the purchaser himself was not at fault."    Laws 1901, p. 294.
The purpose of this provision seems to us to have been mainly to pre-
vent one who had previously purchased four sections from making a
new settlement and purchasing again.    This inhibition was not con-

tained in the previous laws. The language that the Commissioner "is hereby prohibited from selling to the same party more than four sections of land" was probably out of abundance of caution to reaffirm the existing rule on the subject. The right to purchase additional lands is expressly conferred by article 4218f of the Revised Statutes as amended by the Act of 1897 (Laws 1897, page 184), and that article, as to its main provisions, is not affected by the Act of 1901. It contains the following provisions: "When any portion of said land has been classified to the satisfaction of the Commissioner of the General Land Office, under the provisions of this chapter or former laws, such land shall be subject to sale, but to actual settlers only, except where otherwise provided by law, and in quantities of not less than eighty acres or multiples thereof, nor more than four sections containing six hundred and forty acres, more or less; provided, that the purchaser shall not include in his purchase more than two sections of agricultural land; and provided, that where there is a fraction less than eighty acres of any section left unsold, such fraction may be sold. Any bona fide purchaser who has heretofore purchased or who may hereafter purchase any lands as provided herein shall have the right to purchase other lands in addition thereto," etc. The question is, did the Legislature mean by four sections four original surveys, or did they mean lands amounting in quantity to four sections of 640 acres each,—or to 2560 acres? In the primary and broad signification of the term, any division of a thing is a section. But probably by reason of the fact that the United States has surveyed its lands in sections of a square mile each, it has become customary to speak of such a survey as a section. But any survey may be appropriately designated as a section. When in the provision last quoted the Legislature uses the words "four sections consisting of six hundred and forty acres, more or less," they meant surveys, that is, to include surveys intended and purporting to contain the quantity named, —though they might contain more,—and surveys of less than that quantity. In other words, the amount of land the settler was entitled to purchase was to be determined by the number of surveys and not by the quantity in acres. This construction is also borne out by the following provision in the same section from which we have last quoted: "And if the (meaning the purchaser) or his vendor has already resided upon his home section for three years, or when he or his vendor, or both together, shall have resided upon it for three years, the additional lands purchased may be patented at any time." Since the law gives an original purchaser the right to purchase eighty acres or multiples thereof, or an original survey of 640 acres, it is evident that the words "home section" in the foregoing provision include within their meaning a survey of less than 640 acres of land. In the enactments in question, the Legislature were not recognizing a fixed right, but were extending a privilege to purchase; and it might well have been deemed the more practicable and convenient rule to grant the right to purchase three original surveys rather than the quantity of 1920 acres, when such sur-

veys contained less than that quantity.  Besides all this, the survey for which the relator applied and which contained only 457 acres and a fraction was known in the land office as "section 65" and was so described in his application.

We conclude that the relator was entitled to purchase the three sections first applied for but not the fourth; and upon the whole case, that the writ of mandamus should be awarded as to sections 65, 101, and 85, but should be refused as to section 83.

It is accordingly so ordered.  The defendants, the Nicholses, will pay all costs which have accrued by reason of their being made parties to the suit.  All other costs will be paid by the relator.

*Mandamus granted.*