S. A. POWERS, Appellant, v. C. HARTEN et al., Appellees.

**SCHOOLS AND SCHOOL DISTRICTS:** Consolidated Districts—Size
1  of District—''Section.'' The word "section," as used in the requirement as to the minimum size of consolidated school districts, is used in the sense of the ordinary *government* section, whether it be a full section of 640 acres or only a fractional section. (Sec. 2794-a, Code Supp., 1913.)

**ELECTIONS:** Naturalization—Adoption. The adoption by a citizen
2  of the United States of a foreign born minor does not, *ipso facto,* naturalize such minor.

**ELECTIONS:** Privilege of Secrecy as to How Elector Votes. An
3  *illegal* voter, who admits that he did vote on the occasion in question, possesses no right of secrecy as to *how* he voted.

**ELECTIONS:** How One Voted. Circumstances, in and of them-
4  selves, may be sufficient to show *how* a person voted.

**ELECTIONS:** Residence. Evidence reviewed, and held insufficient
5  to show that an elector was not a resident of the precinct in which he voted.

*Appeal from Boone District Court.*—E. M. McCALL, Judge.

MAY 17, 1918.

ACTION to enjoin the establishment of a consolidated school district, and to enjoin certain defendants from act-

ing as officers thereof.   Decree for the defendants.   Plaintiff appeals.—*Affirmed.*

*Frank Hollingsworth* and *Harpel & Cederquist,* for appellant.

*F. W. Ganoe* and *Goodykoontz & Mahoney,* for appellee.

GAYNOR, J.—This action was brought by a resident taxpayer, to have the establishment of a consolidated independent school district adjudged void, and to enjoin the defendants from acting as a board of directors of such district.

The district was organized under Section 2794-a of the Code Supplement, 1913, which provides:

"When a petition describing the boundaries of contiguous territory containing not less than sixteen sections within one or more counties is signed by one third of the electors residing on such territory, and approved by the county superintendent,  *   *   *   and filed with the board of the school corporation in which the portion of the proposed district having the largest number of voters is situated, requesting the establishment of a consolidated independent school district, it shall be the duty of said board, within ten days, to call an election in the proposed consolidated district, for which they shall give the same notices as are required in Section 2746 of the Code and Section 2750 of the Supplement to the Code, 1907, at which election all voters residing in the proposed consolidated district shall be entitled to vote by ballot for or against such separate organization.   When it is proposed to include in such district a city, or town or village, the voters residing upon the territory outside the incorporated limits of such city, town or village shall vote separately upon the proposition for the creating of such new district.   The judges of said election shall provide separate ballot boxes in which shall be deposited the votes cast by the voters from their respective territory, and if a majority of the votes cast by the electors re-

siding either within or without the limits of such city, town or village, is against the proposition to form a consolidated independent corporation, then the proposed corporation shall not be formed. If a majority of the votes so cast in each territory shall be in favor of such independent organization, the organization of the proposed consolidated independent school corporation shall be completed by the election of a board of directors for said school corporation, * * * and when so organized shall not be reduced to less than sixteen sections unless dissolved as provided by this act."

The district was organized under the provisions of this section. It is conceded that every provision of the statute was complied with, except in the two particulars upon which plaintiff predicates his right to maintain this action, and to the relief prayed for.

The first contention of the plaintiff is that the district, as proposed and organized, contained less territory than is contemplated by the statute.

1. SCHOOLS AND SCHOOL DISTRICTS: consolidated districts: size of district: "section."

From a reading of the statute, it will be noted that the proposed territory must contain not less than 16 sections, and that it shall not be reduced at any time to less than 16 sections. That there were 16 government sections included in the proposed territory, is not disputed. The contention is that some of the included sections were fractional; that some of them did not contain 640 acres; that the included territory was something over 100 acres less than 16 *full* sections. This is the first ground upon which the plaintiff relies, and on which he contends that the district was not legally established. Before the act herein set out was passed, the law provided for 16 *government* sections. The amendment omitted the word "government;" and this is said to be suggestive, at least, of an intention to require, not government sections, but sections containing 640 acres each.

It is true that a full section contains 640 acres. The word used here must be understood in its usual and ordinary sense, and, we must assume, was used by the legislature in the sense in which it is usually and ordinarily understood and used. The government, in dividing lands, for convenience and for the purpose of facilitating sale, divided the territory into townships, and subdivided the townships into sections. Surveys were not accurately made, but stakes and stones were placed to indicate the boundaries of sections as surveyed and laid out by the government. Some of these sections overran. Some of them, though not reported fractional, contained less than 640 acres. The fractional sections were caused by lakes and streams and reservations, and by township, lines when the township is more or less than 6 miles in extent in one or both dimensions. Had the legislature intended that each section to be included in the school district should contain not less than 640 acres, we think it would, by apt words, have expressed this thought. If, when it said, "It shall contain not less than 16 sections," it meant 16 sections each containing not less than 640 acres, we think it would have so expressed itself in the statute. Inasmuch as it must have been known to the legislature that there was such a thing as government sections, and that land was sold according to sections and subdivisions thereof, it must be that the legislature meant the use of the word in the sense of government sections, and not in the sense contended for by appellants. Plaintiff's contention, in its fullness, would require an accurate survey, to determine whether, in the territory proposed, each of the 16 sections contained the full quantum of land; and it would follow that, though 16 government sections were included in the proposed district, another section would have to be added, in order to make the quantum of 16 sections, if, peradventure, the land ran short in its measurement of 640 acres to the section.

It is a fact, within the common knowledge of men, that

sections not recorded as fractional contain less than 640 acres. If plaintiff's contention should be adopted, no district would be safe without including more than 16 sections, lest it should turn out, upon an actual measurement, that the 16 sections included do not contain a quantum of land in the aggregate amounting to 16 times 640 acres. As bearing upon this question, see *Brown v. Hardin*, 21 Ark. 324; *Hazelwood v. Rogan*, 95 Tex. 295.

We think the contention of plaintiff, based upon the fact that the 16 sections included in this district did not contain in the aggregate 16 times 640 acres, cannot be sustained.

The second proposition is that illegal votes were cast at the election.

It appears that there were 56 ballots cast, in all. The returns from the election show that there were 29 votes for, and 27 against, the proposed district. It is claimed that there were 2 illegal votes cast. It appears that one Lumen Van Pelt and one Nick Curry voted at this election. It does not appear affirmatively, from direct testimony, how these persons voted. If both these votes were cast in favor of the consolidated district, and are rejected because they are illegal, then it would leave the vote a tie for and against the proposed district. Curry was not a legal voter. He was born in Italy; came to this country when he was a child; and was adopted by a citizen of the United States, when still a child. It does not appear that his father was ever naturalized. The adoption did not have the effect of naturalizing the child. The naturalization of a father operates to confer the rights of citizenship upon the minor child who is dwelling, at the time of the father's naturalization, within the jurisdiction of the United States, or who dwells within the jurisdiction subsequent to the father's naturalization, and during his own minority. See *Conover v. Old*, 80 N. J. L. 535 (77 Atl.

2. ELECTIONS: naturalization: adoption.

1070). This is the only provison for the naturalization of a child by operation of law that can be suggested to cover the case here. It does not do it.

It appears that this Nick Curry voted in good faith; that he believed he was a citizen and entitled to vote; that he was present at the voting place on the day of election. It appears that he was opposing the consoli-

3. ELECTIONS: privilege of secrecy as to how elector votes.

dated district. He admitted that he voted, but refused to tell how he voted,—claimed his privilege. The court sustained his claim of privilege, and in this we think the court was in error. A legal voter has a right to claim the privileges of secrecy. While one who votes illegally cannot be compelled to state whether he voted or not, yet if he admits that he voted, as this witness did, he has no protection under the rule of secrecy, and may be compelled to state how he voted. 9 Ruling Case Law, Section 142, under head of "Elections," and cases cited.

The general rule is that, in order to defeat an election, it must appear that the successful ticket receives such a number of improper votes that, if rejected, the majority would be brought down below that necessary

4. ELECTIONS: how one voted.

to an election. There is no question that the voter himself is in the best position to know just how he voted. Curry, being an illegal voter, the court should have required him to state how he voted. This fact, however, may be proven by circumstances, as well as by direct testimony of the witness. A majority of the legal votes in favor of the proposed district is sufficient. Omitting Curry's vote as illegal, there were but 55 votes cast. The record discloses, to our satisfaction, that Curry voted against the district. This would leave but 26 votes against the district, which, taken from 55, would leave 29 for the district. The finding that Curry was an illegal voter does not destroy the efficacy of the legal votes cast. Assuming that all the

other votes were legal, the record stands, at this point, 29 for to 26 against.

As to Van Pelt, the record discloses that he was a qualified voter; that he was living in the district at the time he voted. It is claimed, however, that he was only temporarily there; that his home and voting place were outside this proposed consolidated district. The record on this point discloses that he is a single man; that he was working for one Claus; that, when he presented himself at the polls, he was asked the question, "Where do you reside?" and he said, "With Mr. Claus." Mr. Claus's home was within the consolidated district. Claus, having been called, testified, in substance, that Van Pelt worked for him during February and March preceding the election,—worked by day's wages; that, when he wasn't busy at carpenter work, he was working as a farm hand, or any other labor he could get. He testified:

5. ELECTIONS: residence.

"I think he began working for me the first of January, as a farm hand, doing chores, and feeding cattle, and then built the hog house for me. While he was doing all this work, he boarded and slept at my house, and, as far as I know, that was his place of residence, or home, at that time. I have known of him being hired out in the same general capacity and staying other places as he did at my place, ever since he has been of age. It was his custom to stay or board and room and make his headquarters and home where he was working. He was at my place during February and March, doing carpenter work; built a hog house. He first came to help me with some other work, chores and other work on the farm, and fed cattle. That was in the winter, before he commenced building the hog house. He got his board and some money besides. I know he didn't drive back and forth from my home every week. He was more than a month building the hog house. He was there before that, six weeks, feeding the cattle and doing chores."

True, this witness says that the father and mother lived about three miles from his place, and outside the district; that the young man was seen frequently going to his father's house; but there is no substantial evidence that he made his home at his father's home; that he made his home at any other place than the place where he was working, as testified to by Mr. Claus. There is some opinion evidence that his home was at his father's place, but the opinions are not based upon a knowledge of any substantive fact. The burden was on the plaintiff, and we think he did not carry it to a successful issue. We think that Van Pelt was a legal voter. There is no evidence which way he voted. The young man was 28 years of age. Ever since he was a boy, he had been doing for himself; had been living where his work required him to live. There is no substantive evidence that he made his home with his parents after his majority. His home was where he was living. It is not necessary that it be a permanent home. The inquiry is, Where was his home at the time he cast the vote in question?

On the whole record, we find no ground for interfering with the judgment of the court below, and it is—*Affirmed.*

PRESTON, C. J., WEAVER and STEVENS, JJ., concur.