# Supreme Court of Texas

## No. 21-0587

Apache Corporation,

*Petitioner*,

v.

Apollo Exploration, LLC; Cogent Exploration, Ltd., Co.;
and SellmoCo, LLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the Eleventh District of Texas

**Argued October 27, 2022**

JUSTICE YOUNG delivered the opinion of the Court.

Contracts regularly address time: when a contractual relationship begins or ends; by when a party must perform; after when it has become too late to do so. Such vital matters illustrate that contractual clarity is often every bit as important when talking about time as about anything else. Clarity comes from sound drafting, but sound drafting relies on confidence in the courts' ability and willingness to consistently interpret similar provisions. Since this Court's earliest days, we have confronted

contracts that use the words "from" or "after" a specified date to measure a length of time. To enhance clarity, provide certainty, and prevent future disputes, our cases have long followed a default common-law rule in that circumstance, under which we must treat the time period as excluding the specified date (which we can call the "measuring date" for calculations). A period measured in years "from" or "after" a measuring date, therefore, ends on the anniversary of the measuring date, not on the day before the anniversary. *See Home Ins. Co., N.Y. v. Rose*, 255 S.W.2d 861, 862 (Tex. 1953). A year "from" or "after" June 30 ends on June 30 of the following year, not June 29.

This default rule is just a default. It does not even apply if time periods are not measured "from" or "after" a given date. Even when the rule does apply, parties may freely depart from it by demonstrating a clear contrary intent within their agreement, such as by expressly providing a different method for calculating time. They also can simply state the exact date on which a period ends. Texas courts will enforce any lawful agreement about how to measure or compute time.

In this case, however, the parties' agreement implicates the default rule without displacing it. We must therefore apply the default rule to the parties' dispute. Because the court of appeals did not do so—and because we also conclude that it incorrectly construed other contractual provisions at issue—we reverse its judgment on the issues presented for our review and remand the case to that court for further proceedings.

# I

The facts and procedural history are complex, but at its core this case concerns whether petitioner, Apache Corporation, breached its

2

purchase-and-sale agreements, or "PSAs," with respondents (whom we collectively call the "Sellers").[1] In those PSAs, Sellers sold 75% of their working interests in 109 oil-and-gas leases to Apache. The parties ask us to resolve key questions of contract construction.

## A

In 2007, respondent Cogent Exploration entered into an oil-and-gas lease for the Bivins Ranch in the Texas Panhandle. Respondents Apollo Exploration and SellmoCo also owned an interest in the lease, and so did Gunn Oil Company. Collectively, Sellers and Gunn owned 98% of the working interest in the Bivins Ranch lease and a number of other leases within what Apache, Gunn, and Sellers called the "Bivins Area," with Gunn having the largest interest at 50.17%.[2] The Bivins Ranch lease originally included 101,287.35 acres, but in 2008 it was amended to add another 14,731.72 acres.

The Bivins Ranch lease stated that its effective date was January 1, 2007, "*from* which date the anniversary dates of this Lease shall be computed." (Emphasis added.) The lease also provided that it would "be in force for a Primary Term of three years *from* the effective date of this Lease." (Emphasis added.)

The parties simultaneously executed and recorded a memorandum of lease. Parties often execute a memorandum of lease to provide record

---

[1] Respondents are Apollo Exploration, LLC; Cogent Exploration, Ltd., Co.; and SellmoCo, LLC.

[2] Gunn was followed by Cogent (31.17%), Apollo (15.67%), and SellmoCo (1%). Other companies not involved in the transactions between Apache and Sellers (and not in this lawsuit) owned the other 2%.

notice of the lease while keeping the lease details confidential. *See, e.g.*, 2 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 19.16 (Supp. 2022); 5 Nancy Saint-Paul, *Summers Oil and Gas* § 56.2 (rev. 3d ed. 2018). For example, in this case, the lease stated that the memorandum was executed "to give record notice of this Lease" and barred the parties from recording the lease itself without the lessors' consent.

The memorandum summarized the lease: it named the parties, described the land, listed some of the lease's provisions, and stated that "Lessors do hereby demise, lease, and let unto Lessee the lands described above upon the terms and conditions of the Lease." However, the memorandum also made clear that the lease, not the memorandum, governed the parties' relationship. The memorandum stated that the lease was "upon the terms, for the consideration, and subject to the conditions in the Lease specified." Notably, the memorandum listed December 31, 2009, as the primary term's expiration date.

The end of the primary term did not necessarily mean the end of the lease. The Bivins Ranch lease allowed the lease to continue after the expiration of the primary term under certain conditions. Relevant here is the lease's continuous-drilling provision. To continue the lease under this provision, the lease required a producing well[3] to be located on the land before the primary term expired. If this prerequisite was met, the lessee then had to create three equally sized blocks and to "conduct[] continuous drilling operations on each designated block" by drilling 20,000 feet in each block each year.

---

[3] A shut-in gas well or a "well for which drilling operations have commenced" also satisfied this requirement.

4

Sellers and Gunn therefore could extend the lease. Before the primary term expired, they drilled a well and divided the lease into the required three blocks. (One of them—the North Block—turned out to be especially significant for this case.) That division did not initially play an important role because annual lease amendments for 2010 to 2014 permitted treating the three blocks as one. Specifically, the lease could—and for each of those years did—continue by drilling 60,000 feet in the aggregate.

During that period, in March 2011, Sellers and Gunn sold 75% of their working interest in the Bivins Area leases to Apache. This gave Apache a 73.5% working interest in those leases.[4] The four companies each executed substantively identical purchase-and-sale agreements with Apache, and two PSA provisions are particularly significant here.

First, § 2.5 allowed each Seller to "back in" for up to one-third of the interests it conveyed to Apache if the leases reached "Two Hundred Percent (200%) of Project Payout."

Second, § 4.1 required Apache to provide Sellers by November 1 of each year a "written budgeted drilling commitment" for the "upcoming calendar year." If this commitment contemplated or would result in the loss or release of any of the leases in the next year, Apache was required to offer "all of [its] interest in the affected Leases (or parts thereof) to Seller at no cost to Seller." If the seller company accepted, Apache was required to "transfer and assign the affected Leases (or parts thereof) to

---

[4] Gunn and Cogent also sold Apache 75% of their working interest in certain leases in an area called the "Tascosa Dome," giving Apache a 60.6% interest in those leases. Together, the Bivins Area and Tascosa Dome leases constitute the 109 leases at issue in this case.

5

Seller." Apache had to make a good-faith effort to follow the commitment, but Apache was not liable if it was unable to fulfill the commitment's objectives despite those efforts.

Also significant is the PSAs' incorporation of a joint operating agreement (JOA) between Apache as operator and the four seller companies (Sellers and Gunn) as nonoperators for the Bivins Area leases.[5]  In 2014, Apache bought out Gunn's interest in the leases, as well as Gunn's PSA rights.

## B

This brings us to 2015.  Until then, the annual amendments had allowed drilling 60,000 feet in the aggregate to extend the lease.  But the Bivins family declined to again amend the lease, so the original 20,000-foot-per-block requirement went into effect for 2015.  That requirement was not met for the North Block for that year.  Apache and Sellers agree that the North Block expired.  But—in what is the central question in this case—they disagree on the precise *date* it expired.

In Sellers' view, the North Block expired or was released on December 31, 2015 (or at some other unspecified time in 2015 when Apache ceased to comply with the continuous-drilling provision).  Apache contends that the North Block expired one day later: January 1, 2016.

The unusual features of this case mean that this single-day discrepancy could entail a full-year consequence.  As noted above, § 4.1 required Apache to offer back leases that its annual written budgeted drilling commitment anticipated losing or releasing in the next *calendar*

---

[5] The PSAs also incorporated a separate JOA for the Tascosa Dome area.

6

year. For each calendar year, the deadline for submitting the written commitment was November 1 of the year before. Therefore, written commitments submitted November 1, 2014, covered leases anticipated to be lost or released between January 1, 2015, and December 31, 2015. Written commitments submitted November 1, 2015, covered leases anticipated to be lost or released between January 1, 2016, and December 31, 2016.

Sellers therefore argue that, if their expiration date of December 31, 2015, is correct, then § 4.1 of the PSAs required Apache to have offered the North Block back to Sellers on November 1, *2014*—the deadline for Apache's 2015 written commitment. Apache argues that if its expiration date of January 1, 2016, is correct, then § 4.1 required Apache to have offered back the North Block on November 1, *2015*—the deadline for Apache's 2016 written commitment.[6]

What difference does all this really make? Oil prices and land values plunged between 2014 and 2015, so the single-day dispute over the expiration turns out to matter a great deal. According to Apache, approximately $180 million of potential damages rides on the answer to whether the North Block portion of the lease expired on New Year's Eve or New Year's Day.

## C

It is not as though the relationship among the parties was smooth

---

[6] Apache does not necessarily agree that Sellers' theory of calculating damages is correct—it simply points out that *if* it is correct, then the one-day difference in expiration dates would have a one-year difference regarding when the relevant calculation would be made.

7

sailing up until they suddenly discovered that the North Block had expired. To the contrary, Apollo and Cogent first sued Apache in April 2014 (about matters primarily related to § 2.5). SellmoCo joined them ten months later. Over time, Sellers added additional claims. Eventually, and most relevant here, Sellers alleged that Apache failed to comply with its PSA obligations (1) related to the § 2.5 back-in trigger[7] and also (2) under § 4.1.[8]

As for § 4.1, Sellers alleged that Apache failed to provide the required annual written budget commitments, failed to offer its interests in expiring leases back to Sellers, and allowed over a hundred leases to terminate—including the North Block—without offering them back to Sellers. According to Sellers, Apache reacquired some of these leases on its own, "washing out" Sellers' interest.[9]

Apache filed four partial summary-judgment motions regarding the issues presented to this Court pertaining to the construction of the PSAs and the Bivins Ranch lease:

(1) **Back-in trigger.** Apache asked the trial court to hold that "Two Hundred Percent (200%) of Project Payout" in § 2.5 of the PSAs meant that Apache had to reach a 2:1 return on

_____

[7] Sellers alleged that Apache failed to provide required written payout statements (required by § 4.2 of each PSA) for 2012 and 2013 showing the progress toward Project Payout and the back-in trigger; overcalculated buyout balances (the amount for each Seller to pay the difference necessary to exercise the back-in trigger) once it did provide a payout statement; and failed to respond in a timely manner to Sellers' audit exceptions.

[8] Claims regarding the North Block were added in March 2016.

[9] Sellers also alleged that Apache failed to provide them the opportunity to acquire their proportionate share of after-acquired acreage as required by the JOAs.

8

investment before Sellers could exercise the back-in trigger; that, if a 2:1 return on investment was not required, the back-in trigger was too indefinite to enforce; that the back-in trigger must be based on costs and revenues attributable to the entire interest Apache received from each Seller, not just one-third of that interest; and that "Project Payout" includes all of Apache's actual costs. The trial court granted this motion "in all of its particulars."

(2) **Construction of and Apache's compliance with § 4.1 of each PSA.** Apache asked the trial court to hold that Apache was not liable for any of the terminated leases. Specifically, Apache argued that it provided the required annual commitments; that it had no obligation to offer back any leases until November 1, 2015, and that it complied with that obligation once it arose; and that it was not otherwise liable for any other terminated leases because of § 4.1's exculpatory clause. Alternatively, Apache asked for a holding that (1) "Leases" in § 4.1 meant only the 109 leases listed in Schedule 1.2(a) of each PSA and (2) "affected Leases" meant only the leases that would be lost or released because of each annual commitment. The trial court granted this motion as to the meaning of "affected Leases."

(3) **North Block expiration date.** In a traditional and no-evidence summary-judgment motion, Apache asked the trial court to hold that the North Block of the Bivins Ranch lease expired on January 1, 2016, and that any damages must

9

therefore be calculated as of November 1, 2015 (the deadline for Apache's 2016 commitment); that there was no evidence that Apache's 2015 commitment (due November 1, 2014) contemplated or would result in the North Block's release during 2015; and that there was no evidence of damages for Sellers' § 4.1 claims if the trial court excluded certain expert testimony. The trial court granted the motion.

(4) **Former Gunn interest.** Apache asked the trial court to hold that "all of Purchaser's interest" in § 4.1 of each PSA referred only to the respective interest Apache had acquired from each individual Seller—*i.e.*, that § 4.1 contemplated offering back to a given Seller only what that Seller had sold, rather than offering each Seller *all* the interests in the same lease that Apache had purchased from *all* other sellers. Specifically, Apache argued that it was not required to offer back the former Gunn interest to Sellers. The trial court granted the motion.

Apache also filed two motions approximately a year apart to exclude the testimony of Peter Huddleston, one of Sellers' expert witnesses on damages.[10] The trial court granted the first to the extent Huddleston's testimony was based on a December 31, 2015 expiration date for the North Block. The trial court granted the second in full.

Finally, Apache brought a no-evidence motion for partial summary judgment on Sellers' claims for breach of contract, negligence, gross negligence, common-law fraud, promissory fraud, fraud by nondisclosure,

---

[10] Sellers had also designated two other expert witnesses on damages, but the trial court excluded both.

statutory fraud, and conversion. Apache argued that Sellers had no evidence of damages and could not prevail on their claims. The trial court granted the motion. It also rendered final judgment for Apache.

The court of appeals reversed in part and affirmed in part. 631 S.W.3d 502 (Tex. App.—Eastland 2021). Relevant here, the court of appeals held that:

(1) a fact issue exists as to the date the North Block expired or was released, *id.* at 531;

(2) § 4.1 of the PSAs required Apache to offer back all its interest in any affected lease, including the former Gunn interest, to Sellers, *id.* at 519–22;

(3) Apache failed to demonstrate that it was entitled to its requested declarations on § 2.5 of the PSAs, *id.* at 524–26;

(4) the trial court should have allowed Huddleston's testimony, *id.* at 541; and

(5) except for Sellers' conversion claim,[11] the trial court should not have granted Apache's no-evidence summary-judgment motion on damages, *id.* at 545.

## D

This appeal requires us to answer three key questions. First, as

---

[11] As presented to us, Sellers' remaining claims are for breach of contract, negligence and gross negligence, common-law fraud, promissory fraud, fraud by nondisclosure, and statutory fraud. Sellers nonsuited their claims for an accounting, declaratory judgment, and trespass to try title. The court of appeals affirmed the summary-judgment orders on Sellers' claims for breach of express trust, breach of fiduciary duty, misapplication of fiduciary property, and conversion. *See* 631 S.W.3d at 533, 544–45. Sellers do not ask us to review these issues.

11

a matter of law, did the North Block expire on December 31, 2015, or January 1, 2016?[12] Second, does § 4.1 of the PSAs require Apache to offer the former Gunn interest to Sellers? Third, what does "200% of Project Payout" mean under § 2.5 of the PSAs? We must also determine whether the trial court properly excluded Huddleston's testimony and properly granted Apache's no-evidence summary-judgment motion on Sellers' remaining claims. We address each issue in turn.

## II

We first turn to the North Block's expiration date. During the relevant time period, the primary term had expired and Apache was operating under the continuous-drilling provision. Under the lease language then in effect, continuing the lease rested on satisfying certain requirements "each year after the expiration of the Primary Term." The North Block's expiration date under the continuous-drilling provision, therefore, turns on the primary term's end date. Based on our precedent and the language the parties used, we hold that the primary term expired on January 1, 2010, and that the North Block therefore expired on January 1, 2016.

## A

Computing time periods has long been a source of confusion in a variety of contexts. A difficult case in the first volume of the Texas

---

[12] Under this case's procedural posture, the parties have not asked us to resolve whether Apache breached § 4.1 by not offering the North Block back to Sellers. We accordingly take no position on that question. Instead, we address only the date the North Block expired, which is relevant to determining damages to the extent Apache did breach § 4.1.

Reports struggled with this question. *See O'Connor v. Towns*, 1 Tex. 107, 109–17 (1846). Each subsequent century has brought a host of new cases. *See, e.g.*, *Hazlewood v. Rogan*, 67 S.W. 80, 83–84 (Tex. 1902); *Nesbit v. State*, 227 S.W.3d 64, 67–69 (Tex. Crim. App. 2007). The particular context of today's case—calculating a time period "from" or "after" a particular date—has been especially recurring.

As we describe in some detail below, this Court has recognized a common-law rule that operates to alleviate the apparent confusion and to provide predictability to parties who choose to measure dates by using language of that kind. The rule provides that the measuring date—the date "from" or "after" a period is to be measured—is excluded in calculating time periods. For periods of years, therefore, the period ends on the anniversary of the measuring date, not the day before the anniversary. *See Home Ins.*, 255 S.W.2d at 862. Thus, under this principle, a period measured in years "from" or "after" June 30 (the measuring date) will end on a future June 30, not a future June 29.

Adopting this frequently used formulation, as the parties did in this lease, must be taken as signaling their intent to embrace the common-law rule. Significant benefits attend this choice because using language for which the courts have recognized a definite meaning bestows certainty regarding how courts will interpret and enforce that language in the event of a dispute. But like other common-law rules that provide for the construction of contractual text, this well-settled default rule in no way prevents parties from choosing their own terms. *See, e.g.*, *Perthuis v. Baylor Miraca Genetics Lab'ys, LLC*, 645 S.W.3d 228, 234 (Tex. 2022).

13

Parties can displace the default rule by adopting text that requires some other result. If they do, our courts will enforce any lawful agreement regarding the calculation of time without requiring any particular formulation or magic language. For example, the parties here could have said in the lease, as they did in the memorandum, that the primary term ended on a date certain. Parties can choose from a myriad of other ways to clearly measure time; they may devise their own bespoke methods, too.

The law has no real interest in *which* method parties select to measure time periods. But it is of exceptional importance that the law provide maximum interpretive clarity to those who enter into agreements, to third parties who may later enter into a contractual relationship governed by an existing contract, and to those who may make important decisions in reliance on such a contract's meaning. The clearer the law is to parties when they draft legal instruments, the more likely it is that their agreed text will reflect, and the courts in turn will enforce, their actual intent. *See id.* at 236. Reliable rules of construction achieve this result by eliminating—or at least greatly reducing—ambiguity. In the aggregate, the clarity of legal rules like this one provides substantial hidden savings by preventing wasteful and costly litigation.

The rule applicable to this case is a stable one that we have articulated since the earliest years of Texas statehood. For example, in addressing a statute imposing a deadline for perfecting an appeal to this Court, we put it this way:

> It is a well-settled rule respecting the computation of time that where it is to be computed from or after a certain day from an act done, the day on which the act is done is to be

14

excluded in the computation unless it appear[s] that a different computation was intended.

*Burr v. Lewis*, 6 Tex. 76, 81 (1851). In other words, by 1851, it was already clear that *both* parts of the rule—the default presumption *and* the parties' freedom to displace it—were "well-settled."

We have since repeatedly observed that the "weight of authority" is that "in construing a lease" or other legal text with a time period "which is to run 'from' a day for a certain number of days, months, or years, ordinarily the day from which it is to run is to be excluded." *Hazlewood*, 67 S.W. at 83. We have applied this principle in multiple contexts, including determining a promissory note's maturity date, *Young v. Van Benthuysen*, 30 Tex. 762, 768 (1868); calculating time from the rendition of a judgment, *Lubbock v. Cook*, 49 Tex. 96, 100–01 (1878); establishing the time frame for filing suit after the rejection of a claim against an estate, *Hunter v. Lanius*, 18 S.W. 201, 202–03 (Tex. 1892); and in calculating a grace period for payment of a life insurance policy, *Aetna Life Ins. Co. v. Wimberly*, 112 S.W. 1038, 1039 (Tex. 1908).[13]

---

[13] It is usually clear when parties depart from the default rule, but we have also had occasion to elaborate on the kind of circumstances that constitute sufficient indicia of objective intent to do so. For example, *McGee v. Corbin*, 70 S.W. 79 (Tex. 1902), concerned the state's distribution of land parcels to raise money for the common-school fund. The commissioner of the general land office had executed the two leases at issue "for a term of two years from the 26th day of August, 1899." *Id.* The leases had to have expired before new applications for those properties could be effective. *Id.* at 80. The parties disputed whether the leases expired at midnight on August *25* or *26*, 1901. We repeated the default rule, *id.*, but held that the leases departed from the rule in that unique context. The commissioner had treated at least one of the leases as expiring on August 25, and we applied a presumption that the land commissioner, a government official, had acted properly and treated all parties alike. *See id.* We further presumed that this was the customary practice of the land commissioner that he applied uniformly to all such leases, therefore

15

We reiterated and added further clarity to the default rule in *Home Insurance.* That case concerned a crop-insurance policy that took effect to various degrees depending on the length of time "after the crop was up and showed a stand." 255 S.W.2d at 862. Echoing our decision in *Burr* from almost exactly a century earlier, we noted that "when time is to be computed *from or after* a certain day or date, the designated day is to be excluded and the last day of the period is to be included *unless a contrary intent is clearly manifested by the contract*." *Id.* (emphasis added). Nothing in the policy "manifest[ed] an intention to include the first day in the computation of the period," *id*. at 863, so the default rule had not been displaced.

Since *Home Insurance,* Texas courts have continued to apply this rule even in contexts that extend well beyond ordinary contracts.[14] Indeed, the principle is sufficiently well embedded in our law that, even without explicitly referencing the default rule, we have treated oil-and-gas leases that measure their primary terms (or other time periods) in terms of years "from" a certain date as expiring on their anniversary

resulting in an established meaning in that singular context. *See id.* at 80–81. The fact that the exact same form was used for all affected leases, and the need to ensure the stability of a vast number of land titles in the area (and perhaps beyond), combined with the unusual governmental context, led us to deem the default rule adequately displaced as a matter of law in this narrow and almost *sui generis* context. *See id.*

[14] *See, e.g.*, *Hinojosa v. Longoria*, 381 S.W.2d 140, 140–41 (Tex. Civ. App.—San Antonio 1964, writ dism'd) (per curiam) (time period for contesting election); *Villarreal v. Brooks County*, 470 S.W.2d 60, 61–62 (Tex. Civ. App.—San Antonio 1971, no writ) (county commissioners' court redistricting orders); *In re Neutral Posture, Inc.*, 135 S.W.3d 725, 729 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (expiration of arbitration clause in a settlement agreement). We express no opinion about the correctness of any of these decisions but note them only for illustration.

date.  Such cases are both old and recent.[15]  And the underlying principle is not merely part of the common law but has been adopted in at least some statutes.[16]

## B

The Bivins Ranch lease used the word "from" to calculate the expiration date of the primary term, so the common-law rule applies. An *ending* date of January 1 may initially generate some cognitive dissonance.  January 1 is New Year's Day—the first day of the year and rarely the last day of *anything*.  But there is no special rule for New Year's Day.  The selection of other dates—as in our June 30 example, or in many of the cases cited above—do not seem particularly startling. The rule is objective and easily applied, and if it applies here, the conclusion is inescapable: the primary term of the lease ended on January 1, 2010.  The only question remaining—at least as to the construction of the lease itself—is whether the Bivins Ranch lease clearly manifests any intent to depart from that rule.  We conclude that it does not.

---

[15] *See Freeman v. Magnolia Petroleum Co.*, 171 S.W.2d 339, 340–42 (Tex. 1943) (primary term in oil-and-gas lease dated April 7, 1930, and which stated that it would "remain in force for a term of ten years from this date" ended April 7, 1940); *Gulf Oil Corp. v. Southland Royalty Co.*, 496 S.W.2d 547, 548, 552 (Tex. 1973) (oil-and-gas lease executed on July 14, 1925, terminated on July 14, 1975, when it stated that it "shall not remain in force longer than fifty (50) years from this date"); *cf. ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 863, 865–66 (Tex. 2018) (non-participating royalty interest that was "reserved for the limited term of 15 years from the date of" a December 27, 1996 deed had a default end date of December 27, 2011).

[16] Notably, the legislature has adopted this principle for statutory computations of days and months.  *See* Tex. Gov't Code § 311.014(a), (c).

17

Because it is so important, we again emphasize that the lease *could* have manifested such an intent. Departing from the default rule "requires no magic language." *Perthuis*, 645 S.W.3d at 237. But the lease's text must include *something* that either expressly describes how the date will be calculated or that, at minimum, is clearly incompatible with the default rule, amounting to displacement by necessary implication.[17] *See Home Ins.*, 255 S.W.2d at 862–63. Requiring such clarity "precludes *post hoc* efforts to rewrite contracts . . . under the guise of ambiguity." *Perthuis*, 645 S.W.3d at 235.

This principle follows from our duty to determine a contract's meaning by looking to the parties' intent as expressed within the text. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018). "A contract's plain language controls, not what one side or the other alleges they intended to say but did not." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) (internal quotations omitted). Otherwise, meaning could never be confidently predicted and litigation could never be avoided, destroying all the benefits that flow from having interpretive principles that apply neutrally and equally. We start with the two lease provisions directly relevant to the expiration of the primary term. The lease's introduction states:

> THIS AGREEMENT, effective the 1st day of January, 2007 (the "Effective Date"), *from which date* the anniversary dates of this Lease shall be computed . . . .

---

[17] For example, we have noted that such clear intent is present when necessary to ensure stability for land titles in unique governmental contexts, *see supra* note 13 (discussing *McGee*, 70 S.W. at 80–81), or to "preserve rights, prevent forfeitures and favor parties, where penal consequences are sought to be enforced," *O'Connor*, 1 Tex. at 116.

18

(Emphasis added.) The lease's primary term provision, in turn, states:

> Subject to the other provisions hereof, this Lease, which is a "Paid-up" Lease requiring no rentals, shall be in force for a Primary Term of three years *from the effective date* of this Lease.

(Emphasis added.)

Nothing in these provisions clearly entails a departure from the default rule. If anything, the reference to "anniversary dates" in the introduction to the lease indicates that the parties intended to *use* the default rule. We see no other role or purpose for the "anniversary dates" language in the lease,[18] and neither Sellers nor Apache has suggested one. Regardless, at minimum, this language means there is no clear intent to displace the rule, which is reason enough to reject Sellers' position. Accordingly, the lease unambiguously imposes a January 1 expiration date for the primary term.

Sellers advance several forceful arguments for reading the Bivins Ranch lease as departing from the default rule. The possibilities include: (1) the effective date; (2) the 2010–2014 amendments; and (3) the memorandum of lease. At minimum, Sellers argue that these features

---

[18] In oil-and-gas leases, "anniversary date" language is often used to denote "[t]he date on which payment of delay rental or shut-in gas well royalty must be made in order to keep a lease effective" under a lease's delay-rental clause or shut-in gas well clause. 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers*, *Oil and Gas Law* 51 (LexisNexis Matthew Bender 2022). But the Bivins Ranch lease is a paid-up lease, which is a lease "under which all delay rentals bargained for are paid in advance, and this single payment maintains the lease during the primary term." *ConocoPhillips*, 547 S.W.3d at 874. Delay-rental payments due on the lease's anniversary date were therefore unnecessary. And the lease's shut-in royalty clause measures time based on the anniversary of the date the well is shut in, not the anniversary date of the lease itself.

generate sufficient ambiguity as to leave a fact question about the parties' intent, thus foreclosing summary judgment on this point. We cannot agree, however, because we are not prepared to undermine the stability that comes from over 170 years of our case law. None of Sellers' arguments—either individually or collectively—demonstrate the requisite textual intent to depart from the default rule. We address each of them in turn.

## 1

Sellers argue that the lease's effective date indicates that the parties to the lease intended a December 31 expiration date. According to Sellers, because the lease was effective January 1, 2007, concluding that the primary term expired on January 1, 2010, would result in a primary term of three years and a day, not three years. For the proposition that the use of an effective date negates the default common-law rule, they point to *Home Insurance* and cases from other courts. We think that this argument would subvert rather than apply the rule.

Sellers note that *Home Insurance* distinguished a court of appeals case—*Acme Life Insurance Co. v. White*—that involved a two-year clause limiting coverage for suicide in a life-insurance policy. In *Acme*, the policy's effective date was January 17, 1933, but the policyholder committed suicide on January 17, 1935. 99 S.W.2d 1059, 1060–61 (Tex. App.—Eastland 1936, writ dism'd). The *Acme* court held that this two-year period ended on January *16*, 1935, not January *17*, 1935, and therefore did not protect the insurance company. *See id.* at 1061. *Acme*, however, is not a precedent of this Court, and it involved a confluence of factors unique to the context of suicide-liability limitations that are

absent here.[19]  *Home Insurance* certainly did not endorse a broad exception that would swallow the very rule that it was confirming.  We cannot do so either.[20]

Though perhaps technically accurate to say that ending the period on the anniversary date creates a primary term of "three years and a day," we fail to see why that matters.  Parties are not confined to round numbers.  Their contractual relationships generally can endure however long—and for precisely as long—as the parties wish.  If the parties so desired, they easily could have drafted the lease using language that clearly included the effective date in the calculation.  They could have said that the primary term was to last for three years and no longer.  They also, of course, could have expressly included a December

---

[19] Sellers also cite another lower-court case as an example of reading a period of years to end the day before the anniversary date.  *See Home Benefit Ass'n v. Robbins*, 34 S.W.2d 329, 331 (Tex. Civ. App.—Waco 1930, no writ).  We express no view about *Robbins* beyond observing that nothing in that case is inconsistent with our conclusion today.  The disability-benefits certificate at issue had to have been "in force for a period of one (1) year *prior to sustaining said accident*," *id.* at 330 (emphasis added), not "in force for a period of one year *from the effective date.*"

[20] The proposition that an effective date should be included when calculating a time period is far from a consensus principle of law.  *Compare, e.g., Ratcliff v. La. Indus. Life Ins. Co.*, 169 So. 572, 573 (La. 1936) (including the first day a life insurance policy was in force to compute time when the relevant policy language was "if death occur one year thereafter" the relevant date), *with, e.g., Winn v. Nilsen*, 670 P.2d 588, 589–91 (Okla. 1983) (holding that a five-year primary term expired on its anniversary date and noting that, though a lease (unless it states otherwise) takes effect on the day it is executed, "[w]hen . . . the time is used in the context to effect a simple identification of a particular time period, an anniversary-to-anniversary period is indicated," *id.* at 590), *and E. Oil Co. v. Coulehan*, 64 S.E. 836, 838–39 (W. Va. 1909) (holding that a five-year term in an oil-and-gas lease ended on the anniversary date notwithstanding the effective date).

31 end date. But the construction "from" an effective date, without more, does not clearly communicate any such intent,[21] especially since parties *do* sometimes create time periods that both contain one extra day and end on the day *after* the anniversary.[22] Time periods add "and a day" in all sorts of circumstances, legal and nonlegal. The old common-law rule was that if a victim died more than a year and a day after the alleged crime, it could not be homicide.[23] "A year and a day" criminal sentences remain common; in some systems, including under federal law, punishments of a year as opposed to "a year and a day" demarcate the line between a felony and a misdemeanor. *See* 18 U.S.C. § 3559(a); *United States v. Graham*, 169 F.3d 787, 792 (3d Cir. 1999). Shahrazad

---

[21] There is no indication of any settled meaning requiring an effective date in the primary term of an oil-and-gas lease to be included in the calculation of time. *Compare Hardin–Simmons Univ. v. Hunt Cimmaron Ltd. P'ship*, No. 07-15-00303-CV, 2017 WL 3197920, at \*7 (Tex. App.—Amarillo 2017, pet. denied) (noting that the parties did not dispute that a lease with a five-year primary term starting August 1, 2006, had a default end date of July 31, 2011), *with Clayton Williams Energy, Inc. v. BMT O & G TX, L.P.*, 473 S.W.3d 341, 344–46 (Tex. App.—El Paso 2015, pet. denied) (noting that "[t]he Bass Lease's primary term began June 1, 2008 and was slated to end three years later on June 1, 2011 per the habendum clause," *id.* at 346, when the lease stated that it would "remain in force for three (3) years from the Effective Date hereof," *id.* at 344). At least in practice, in other words, simply having an effective date does not clearly communicate an intent to depart from the default rule.

[22] *See, e.g.*, *Silo Rest. Inc. v. Allied Prop. & Cas. Ins. Co.*, 420 F. Supp. 3d 562, 573, 577–80 (W.D. Tex. 2019) (applying Texas law to hold that an insurance policy's limitations period of "within 2 years and one day from the date the cause of action first accrues" ended the day after the anniversary).

[23] Parliament did not abrogate that common-law rule until 1996. *See* Law Reform (Year and a Day Rule) Act 1996, c. 19. The Tennessee Supreme Court abolished that doctrine using its common-law authority, leading to a U.S. Supreme Court case about the consequences of that abolition. *See Rogers v. Tennessee*, 532 U.S. 451 (2001).

spent not one thousand nights telling her stories but, as the eponymous title of Burton's translation recounts, a "thousand nights and a night."

All of this is to say that the courts typically have no interest in the parties' choice of a term's length. Add a day, subtract a day—the parties may do what they like. But courts *do* value having a predictable rule that will provide certainty to contracting parties and treat all of them the same. *See Smith v. Dickey*, 11 S.W. 1049, 1050 (Tex. 1889) (noting, in the context of calculating time, the benefit of precedential "uniformity" and of "establish[ing] a certain rule, by which parties may in future be guided").

Sellers, however, also point to a Court of Criminal Appeals case holding that a ten-year probation term that started on April 29, 1994, ended on April *28*, 2004, not April *29*, 2004. *See Nesbit v. State*, 227 S.W.3d 64, 65 (Tex. Crim. App. 2007). That case distinguished time periods during which "one must perform some act" from time periods during which "one may exercise a particular right (or must suffer a particular penalty)." *Id.* at 67. Sellers argue that the Bivins Ranch lease falls into the latter category and the effective date must therefore be included in the calculation. Whatever the merit of the *Nesbit* categories in the criminal context, such a fine distinction is bound to generate wasteful litigation in this context.[24] That likelihood is heightened for contracts like the Bivins Ranch lease, in which the primary term functioned *both* as a period during which the lessee could exercise a

---

[24] Notably, the conclusion in *Nesbit* is consistent with our observation in *O'Connor v. Towns* that time should be computed to "favor parties, *where penal consequences* are sought to be enforced." 1 Tex. at 116 (emphasis added); *see also Smith*, 11 S.W. at 1050. That thumb on the scale, of course, does not exist with respect to freely and mutually agreed contracts among equals.

particular right (leasing the property) *and* during which the lessee had to perform some act (meeting the requirements to perpetuate the lease).

In short, we reaffirm that the mere use of an effective date within a contract is not enough to depart from the default rule.

**2**

Sellers also allude to the 2010–2014 amendments. To the extent that Sellers read these amendments to inform the analysis,[25] we conclude that the amendments would support reading the lease to adhere to the default rule.

As described earlier, the amendments allowed the lease to continue under the continuous-drilling provision if 60,000 feet in the aggregate were drilled each year as opposed to 20,000 feet on each block. More important for our purposes, however, is *how* the amendments addressed timing. Start with the following language from the original lease:

> By "continuous drilling operations on each designated block" is meant the commencement of a well on each block and the actual drilling by Lessee of 20,000 feet in one or more wells on each block *each year after the expiration of the Primary Term*.

(Emphasis added.) Each amendment replaced the italicized language in two important ways: (1) the amendments used "during" instead of "after" and (2) the amendments either referred to the "calendar year" or to a defined time period with a December 31 end date (although two were later extended to April 1).

---

[25] Sellers emphasize the amendments' express December 31 end dates in their briefing's *description* of the record—that is, in their statement of facts—rather than in their formal argument section regarding the end date of the primary term. We address the amendments in the interest of completeness.

The amendments' use of markedly different durational language ("during" instead of "after" or "from") and imposition of specific dates not necessarily connected to the start and end dates of the primary term show a textually demonstrable intent to *differ* from the primary term in the method of measuring time. And, moreover, they show that the parties were perfectly capable of using ordinary language to depart from the default rule when they wished to do so. Indeed, the amendments confirm the point we have made—that it is easy to accomplish such a departure.

The 2010 amendment—"executed to be effective as of January 1, 2010"—stated that "the Lease is *currently* in full force and effect beyond its Primary Term." (Emphasis added.) Arguably, this indicates an understanding that the primary term had *already* expired as of January 1, 2010. Regardless of whether the lease and this statement should be construed together, however,[26] this statement does not amend the primary-term provision (although the parties certainly *could* have done so) or otherwise provide the clarity necessary to displace the default rule.

**3**

Having determined that the lease's date provisions and the 2010–2014 amendments do not clearly indicate a departure from the default rule, we next address the memorandum of lease. The court of appeals held that a fact issue existed regarding the primary term's expiration date largely because of its conclusion that the memorandum should be construed together with the lease, not treated as extrinsic evidence. *See* 631 S.W.3d at 530–31. We must again respectfully disagree with the

---

[26] This statement was within the parties' agreement to amend the lease but was not added to the text of the lease itself.

25

court of appeals' conclusion.

The memorandum states that the primary term expires on December 31, 2009:

> Subject to other provisions of the Lease, the Primary Term thereof expires on the 31st day of December, 2009. The Lease contains other provisions with respect to lease continuation, operations, royalties, notice by Lessee to Lessors, assignments, and provisions relating to the protection of the surface owners' rights and estates.

And as noted above, the memorandum also stated that the transaction was "upon the terms, for the consideration, and subject to the conditions in the Lease specified."

At least for argument's sake, we can agree that this memorandum indicates the parties' actual intent that the primary term would end on December 31, 2009. If such an explicit end date had been included in the lease itself, of course, that would have sufficed to depart from the default rule. The statement's placement in the *memorandum*, however, presents two potential issues. First, should the memorandum be construed together with the lease? And second, regardless of the answer to that first question, does the memorandum's important caveat (*i.e.*, that it is "subject to the conditions in the Lease specified") mean that the lease's date provision prevails over the memorandum's December 31 date?

We need not resolve the first question. Again, at least for argument's sake, we can accept Sellers' contention that we should read the memorandum along with the lease. Indeed, we commonly read "multiple separate contracts, documents, and agreements" together as "part of a single, unified instrument." *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020) (internal quotations omitted); *see also Burlington Res. Oil &*

*Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 208 (Tex. 2019). Whether those principles apply here is immaterial, however, because the second question—concerning the memorandum's caveat—is dispositive.

The memorandum expressly subjugates itself to the lease, so it does not matter whether we treat the memorandum as extrinsic evidence or as a document to be read with the lease. Both routes lead to the January 1, 2010 end date. If the memorandum is extrinsic evidence, it may only be considered if the lease is ambiguous, but it cannot be used to *create* ambiguity. *See TRO–X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 466 (Tex. 2018). And if the two documents are construed together, as we assume they should be, we must stop when the memorandum's own text prioritizes the lease's terms, proclaiming that the lease controls whenever the two are in conflict. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 126 (2012) ("Subordinating language (signaled by *subject to*) . . . merely shows which provision prevails in the event of a clash[.]").

As we have concluded above, the lease unambiguously imposes a January 1 expiration date. The memorandum itself requires the lease's January 1 expiration date to prevail over the memorandum's own December 31 date.[27]

---

[27] Scalia and Garner soundly advise drafters that "*[s]ubject to* should never introduce a provision that completely contradicts the provision that the *subject to* phrase modifies." Scalia & Garner, *supra*, at 126. If a text insisted on pointlessly doing so, of course, the superior authority would still prevail over the subordinate one. A statute that "completely contradicts" a constitutional provision, after all, would unquestionably remain "subject to," and must yield to, whatever the Constitution said. But, though we do read the lease to institute a January 1 expiration date, we also do not read the memorandum to violate this sound drafting principle. In any event, the "subject to" phrase does

Sellers also argue that, because the memorandum was *recorded*, its December 31 end date binds Apache. They cite our statement that "[i]t is well settled that a purchaser is bound by *every* recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex. 1982) (internal quotations omitted). *Westland Oil*, however, undermines Sellers' contention. In that case, we noted that purchasers are generally responsible for following the paper trail of documents referenced in recorded instruments. *See id.* at 907–08. The *recorded* memorandum in this case took pains to make manifest that the terms of the *unrecorded* full-length lease control over the memorandum, thus putting interested parties on notice of the need to consult the lease before acting in reliance on the memorandum. Apache therefore correctly relies on the lease itself.

## C

Finally, Sellers argue that the North Block actually terminated on December 31, 2015, or at some point during 2015 when Apache ceased to comply with the continuous-drilling provision. In Sellers' view, the time Apache ceased to comply (and the lease automatically terminated), based on when Apache stopped continuous-drilling operations, is a fact issue that Apache had to conclusively prove to be

---

not directly repudiate the lease, which does not bluntly say "January 1." At the same time, the lease can unambiguously compel that result despite not expressly stating it—that is the whole point of the default rule discussed in Part II.A, *supra*. The memorandum may well have expected December 31 to be the final date, but its language clearly (and we must assume purposefully) leaves the ultimate determination to the lease itself.

entitled to summary judgment.

We disagree. The lease states that the continuous-drilling requirements must be met "*each year after* the expiration of the Primary Term." (Emphasis added.) Therefore, we agree with Apache that, under the text of the lease, the lessees only ceased to comply after each January 1 passed without having satisfied the necessary drilling obligations. In this case, it is undisputed that, as of January 1, 2016, the continuous-drilling requirements had not been fulfilled for the North Block.

However, Sellers also point to a release Apache executed for the North Block. The release was dated March 2016 and signed by Apache in August 2016, but it stated that it was effective as of December 31, 2015. Sellers correctly note that the release is extrinsic evidence that we may not use to determine the lease's meaning. *See TRO–X*, 548 S.W.3d at 466. However, Sellers argue that the release constitutes evidence of when Apache ceased to comply with the continuous-drilling provision.

Since we have concluded that the primary term expired January 1, 2010—and therefore that the North Block expired January 1, 2016—the question becomes whether Apache retroactively released the North Block early. The continuous-drilling provision requires the lessee to release the applicable block once the lessee ceases to comply with the requirements to maintain the lease. The lease also contemplates early releases.

To determine whether a *signed release* could retroactively change the *termination date*, we examine the lease's terms. *Cf. Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861 (Tex. 2005) (addressing whether the oil-and-gas lease at issue authorized units to be pooled with a retroactive effective date). Even assuming that the lease authorized retroactive

releases, however, the release itself does not purport to retroactively *change* the date of a termination that had *already occurred*. Whatever the release may have said, it did not change what matters here: the historical fact that the North Block terminated on January 1, 2016.

\*     \*     \*

To summarize: We conclude that the Bivins Ranch lease does not depart from the default rule. The lease therefore unambiguously creates a January 1 expiration date. *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) ("A written instrument that can be given a certain or definite legal meaning or interpretation is not ambiguous and will therefore be construed as [a] matter of law."). Apache and Sellers agree that the requirements to continue the North Block during the pertinent time period were not satisfied, and we have concluded that Apache did not retroactively change the date the North Block expired. No question of material fact regarding the North Block's expiration date remains. The North Block expired on January 1, 2016.

The duty of the courts is to accurately discern the intent expressed in the lease. *See, e.g.*, *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006). The duty of contracting parties is to ensure that their *actual* intent is reflected in the legal documents they use to memorialize their agreements. "[I]t is not the actual intent of the parties that governs, but the actual intent of the parties *as expressed in the instrument as a whole*[.]" *Luckel v. White*, 819 S.W.2d 459, 462 (Tex. 1991). Holding fast to legal principles is especially important in contexts—like the computation of time—that are naturally susceptible to confusion. The parties to the Bivins Ranch lease could have easily

30

departed from the default rule. They simply needed to say so clearly within the four corners of the lease. *Cf. Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010) ("[H]ad [the exclusion] been intended to be so narrow . . . it would have been simple to have said so."). They did not do so here.

## III

We next address two arguments that arise under the PSAs.

## A

Sellers argue that § 4.1 of each PSA required Apache to offer back to each Seller *all* of Apache's interest in the North Block. They contend that this includes the interests Apache purchased from *other* sellers, and specifically the former Gunn interest, not merely the respective interest that Apache purchased from each individual Seller. Section 4.1 states in relevant part:

> Purchaser hereby covenants to make a good faith effort to follow the Commitment in order to perpetuate the Leases, but if any Commitment contemplates or will result in the loss or release of one or more of the Leases (or parts thereof), then Purchaser shall concurrently offer *all of Purchaser's interest in the affected Leases (or parts thereof)* to Seller at no cost to Seller and upon Seller's acceptance of such Leases, Purchaser shall transfer and assign the affected Leases (or parts thereof) to Seller.

(Emphasis added.) Sellers make three main points in support of their position. We will sketch those points and then address them together. First, Sellers note that § 4.1's text refers to "all" of Apache's interest in the leases at issue. In Sellers' view, "all" means just that—*all*—and therefore encompasses the former Gunn interest.

Second, Sellers argue that § 4.1 should be read in light of § 2.5,

31

which—unlike § 4.1—specifically limits the "interest" involved to the interest that each Seller conveyed to Apache. For example, § 2.5 states that "Seller shall have the right, but not the obligation . . . to back-in for up to one-third (1/3rd) of the *interests conveyed to Purchaser in and to the Assets hereunder at Closing*[.]" (Emphasis added.) Section 2.5 repeatedly distinguishes between the interest purchased from *that particular Seller* and interests purchased from others.

Third, Sellers point to § 4.1's purpose statement. If § 4.1 were to be triggered, no Seller had any obligation to accept the affected Leases, but § 4.1 also explains that

> [t]he purpose and intent of, and Purchaser's agreement pursuant to, this provision is to provide Seller the option and ability to perpetuate all the Leases so offered to Purchaser through a drilling program with one drilling rig, and this provision shall be interpreted to afford Seller that option and ability.

In Sellers' view, unless offered interests purchased from other Sellers, a minority Seller—such as SellmoCo, with only a 1% working interest in the Bivins Area leases prior to the PSAs—would have difficulty perpetuating the lease on its own, contravening that purpose clause.

Sellers argue that these textual indicators compel their reading of § 4.1. But they cannot overcome one glaring problem. As Apache notes, § 4.1 expressly refers to the singular "Seller," not the plural "Sellers." And each Seller had its own PSA. Therefore, if Apache was required under one PSA to offer back to *each individual Seller* the interests it purchased from *all others*, it would owe the *same* interests to each other individual Seller. The obvious difficulty is that if Sellers' interpretation is correct, then multiple parties would each simultaneously

have the right to the exact same interests.

Two parties can own *part* of the same interest, but two parties cannot each separately own 100% of it. Would the first party to accept get everything? Would Apache have the right to prioritize the order in which it approached each Seller, or to allocate the interests as it saw fit, or to serve its own interests? Must the new allocation be tethered to the old allocation? Could a consortium of the Sellers develop a new entity to accept the interests jointly? What if some of them chose not to participate? Would Apache be liable if it chose one of these methods and some or all of the Sellers challenged it? Would Apache be liable if the Sellers later fought over who was entitled to what share?

If § 4.1 expected Apache to make the offer that Sellers claim, it is clear that the parties' agreements would have explained how the process of distributing these interests would work. Though § 4.1 provides no such direction, both the Bivins Area and Tascosa Dome JOAs provide guidance as to how to distribute interests in *different* situations. For example, under the JOAs, when one party wants to surrender a lease, that party is required to give notice to "all parties." If "all parties" do not consent, the surrendering party "shall assign . . . all of its interest in such Lease, or portion thereof, . . . to the parties not consenting to such surrender." "If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties."

A similar but not identical mechanism applies when a party abandons an already-producing well. The JOAs also establish a proportionate-allocation system when a party renews or replaces a lease

33

subject to the JOAs. In addition, the area-of-mutual-interest (AMI) provision requires any party who acquires an interest in lands within the AMI to offer each other party "the opportunity to acquire its proportionate share of the AMI Acquired Interest[.]"

Particularly given the detailed distribution mechanisms in other provisions, the lack of one in § 4.1 indicates that Apache only had to offer each Seller the interest acquired from that particular Seller.[28] If the parties intended some other procedure to apply, it was their responsibility to include it in the text.[29]

If any doubts remained, they would be dispelled by our obligation to preserve rather than remake a contract's text. Imposing the duty on Apache that Sellers demand would amount to drafting language—like the language in other provisions that described procedures for reallocating interests—and adding it to § 4.1. Our interpretation, by contrast, is consistent with the language as written; it requires us to neither add

---

[28] Sellers argue that after-acquired title provisions in the JOAs—specifically the AMI provision—required Apache to offer Sellers a proportionate share of applicable lease interests, such as the former Gunn interest, that Apache acquired after executing the PSAs. Sellers contend that we should read § 4.1 in light of this requirement. However, as noted above, the fact that the AMI provision—in contrast to § 4.1—includes a proportionate-distribution mechanism undermines rather than helps Sellers' argument. And even if Sellers are correct that the AMI provision required Apache to offer Sellers a proportionate share of the former Gunn interest—a question on which we take no position—that speaks only to whether Apache violated the AMI provision, not whether it violated § 4.1. The two are separate questions.

[29] The parties used a model-form agreement for the JOAs. They went line-by-line through the model form, crossing out provisions that they decided not to apply, including certain provisions related to maintaining uniformity of interests in the contract area. The parties' use of the model form confirms that they carefully addressed circumstances in which reallocation might be necessary.

nor subtract text in describing what Apache must do. Indeed, the word "all" in § 4.1 is equally understandable if read in juxtaposition to § 2.5's back-in trigger: in contrast to § 2.5, in which each Seller receives only *one-third* of the interest it sold to Apache, under § 4.1, each Seller receives *all* the interest that *it* sold to Apache. Sellers argue that § 4.1's purpose provision supports their argument, but they have not explained why its purpose could not be achieved through some other means, such as any interested Sellers buying out the remaining interests. They could achieve that goal together by each agreeing to accept its *own* interest and then transferring or selling it to others at whatever rate was desirable. Placing that burden on Apache, though, is impermissible absent a textual warrant to do so.

Sellers contend that it *was* possible for Apache to perform under the contract. They cite an October 29, 2015 letter from Apache as evidence. This joint letter to Sellers included Apache's 2016 commitment and offered Sellers collectively all of Apache's interest in leases that the commitment anticipated losing or releasing. The letter requested that Sellers inform Apache "whether each Seller accepts this offer, and, if so, the interest in the affected Leases that each Seller accepts." Apache counters that (1) the letter clarifies that it is not intended to waive any arguments for litigation and (2) the letter does not actually satisfy § 4.1 because it offered Apache's interest to Sellers *collectively* instead of *individually*.

We agree that this letter, though perhaps a workable and sensible solution, does not actually conform to § 4.1's text. Apache's one-time willingness to try only underscores that there was no way for Apache or

any party to really *know* how to do it. The parties may well have intended a proportionate-allocation system similar to those in the JOAs. Or perhaps they intended for Apache to take the approach in its letter. But they did not say either, much less which, and we decline to import such a mechanism into the text. We therefore conclude that Apache was not required to offer the former Gunn interest back under § 4.1.[30]

## B

We next turn to § 2.5 of each PSA, which provides "the right, but not the obligation," to "back-in for up to one-third (1/3rd) of the interests conveyed to Purchaser in and to the Assets hereunder at Closing." This right is "exercisable at Two Hundred Percent (200%) of Project Payout (the **'Back-In Trigger'**)." In turn, "Project Payout" is defined as follows:

> "**Project Payout**" means the first day of the next calendar month following that point in time when the sum of the cumulative Production Income and/or Other Revenues, equals the sum of the Preliminary Purchase Price . . . , the Drilling Credit, the actual costs borne by Purchaser to explore, drill and complete all the wells (whether productive or dry hole) on the Leases (to the extent such costs are attributable to interests which Purchaser acquired in and to the Leases hereunder, but excluding any and all costs associated with other interests which Purchaser may acquire in the Leases), and the actual Operating Costs borne by Purchaser for operation of the Leases and all wells located thereon.

Section 2.5 also defines "Production Income," "Other Revenues," and "Operating Costs."

Apache argues that "Two Hundred Percent (200%) of Project

---

[30] Because we conclude that § 4.1 did not require Apache to offer back interests Apache purchased from other parties, we do not address whether such a requirement would amount to a forfeiture or violate the rule against perpetuities.

Payout" refers to the point when the specified revenues *double* specified expenses. While Sellers' argument is a bit unclear, Sellers seem to argue that it refers to when specified revenues *equal* specified expenses.

We agree with Apache that § 2.5 requires a 2:1 ratio for specified revenues versus specified expenses. True, Apache's reading results in a rather awkward linguistic construction in which the "Back-In Trigger" would be literally read (if the definition is ported into the text) as "200% of the first day of the next calendar month following that point in time when" specified revenues equal specified expenses. Only Apache's reading, however, explains the presence of the 200% language.[31]

The court of appeals also held that there is a fact issue as to whether Apache's costs should all be included in the Project Payout calculation. *See* 631 S.W.3d at 525. Sellers assert that the court of appeals properly decided this issue, and Apache argues that it is irrelevant. We therefore do not address it here.

## IV

We next consider whether the trial court properly excluded the testimony of Peter Huddleston, one of Sellers' expert witnesses. Huddleston opined on the fair market value of the leases at issue.

---

[31] The court of appeals reversed the trial court's judgment on this issue because the court of appeals read Apache's § 2.5 summary-judgment motion to use the term "investment" to replace the contractually defined term "Project Payout." *See* 631 S.W.3d at 524. We agree with Apache, however, that its use of "return on investment" was a shorthand way of referring to the more detailed "Project Payout" definition. Nothing in our interpretation alters "Project Payout" as a defined term. Because we conclude that the back-in trigger is reached when the specified revenues double the specified expenses, we need not reach Apache's alternative argument that § 2.5 would otherwise be too indefinite to enforce.

Apache filed two motions to exclude his testimony. The first, filed in February 2018, was based both on his methodology and the fact that his damages calculations for the North Block rested on a December 31, 2015 expiration date. The trial court granted this motion in part, excluding Huddleston's testimony to the extent it was based on an expiration date for the North Block other than January 1, 2016.

Just over a year later, Apache filed a second motion to exclude Huddleston's testimony, this time because Huddleston had not updated his calculations to account for the trial court's rulings regarding the North Block's expiration date and the former Gunn interest. The trial court granted the motion in full.

Because the court of appeals reversed the trial court's summary-judgment orders regarding the expiration date of the North Block and how to account for the former Gunn interest, it also reversed the trial court's exclusion of Huddleston. *See id.* at 541. However, as discussed above, we conclude that the North Block expired on January 1, 2016, and that Apache was not required to offer Sellers the former Gunn interest. The trial court therefore properly excluded Huddleston's testimony.[32]

---

[32] Sellers also argue that the trial court abused its discretion in excluding Huddleston's testimony because, according to Sellers, no rule requires an expert to change or modify his opinion after the trial court grants partial summary judgments. It can hardly be an abuse of discretion to exclude expert testimony that is based on legal conclusions already rejected by the trial court. However, Sellers further contend that the trial court erred by excluding Huddleston's opinions in full because his opinions also contained information not based on the North Block's expiration date or on how to account for the former Gunn interest. Apache, in contrast, argues that Sellers waived this issue. We express no view on the merits of this dispute or whether it was preserved for the court of appeals' review; that court may address these matters in the first instance on remand.

## V

Finally—finally—Apache argues that, if the trial court properly excluded Huddleston's testimony, we should affirm the trial court's order granting Apache's no-evidence summary-judgment motion on the remaining claims. Without Huddleston's testimony, Apache argues, Sellers have no evidence of damages, a necessary element of each of their claims.

The court of appeals reversed the no-evidence summary-judgment order on the basis that Huddleston's opinions should have been admitted. *See id.* at 544. This basis for reversing the order was improper because of our holding that at least parts of Huddleston's testimony were properly excluded. However, given its disposition, the court of appeals had no need to address whether Sellers otherwise produced evidence sufficient to demonstrate damages for the claims still at issue. We think it prudent to remand to the court of appeals to address this issue in the first instance and then to render judgment or remand to the trial court as appropriate.

## VI

We reverse the judgment of the court of appeals as to those issues that the parties presented for our review. We remand to that court for further proceedings.

Evan A. Young<br>
Justice

**OPINION DELIVERED:** April 28, 2023

39